LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, et al., Plaintiffs-Appellants, Cross-Appellees,

v.

Lester P. VOIGT, et al., Defendants-Appellees, Cross-Appellants.

UNITED STATES of America, Plaintiff-Cross-Appellee,

v.

STATE OF WISCONSIN, a sovereign state, and Sawyer County, Wisconsin, Defendants-Cross-Appellants.

Nos. 78–2398, 78–2443 and 79–1014.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1982.

Decided Jan. 25, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc March 8, 1983.

Gene M. Potack, James M. Jannetta, Kathryn L. Tierney, Howard J. Bichler, Wisconsin Judicare, Inc., Wausau, Wis., for plaintiffs-appellants, cross-appellees.

Mary V. Bowman, Asst. Atty. Gen., State of Wis., Dept. of Justice, Madison, Wis., for defendants-appellees, cross-appellants.

Before CUMMINGS, Chief Judge, WEICK, Senior Circuit Judge,* and PELL, Circuit Judge.

PELL, Circuit Judge.

The principal case on this consolidated appeal, *Lac Courte Oreilles Band v. Voight (LCO)* was an action for a declaratory judgment that a band of Lake Superior Chippewa Indians (LCO band) has retained treaty-reserved off-reservation hunting, fishing, trapping and gathering rights, collectively termed "usufructuary rights," in public lands in the northern third of Wisconsin and that such rights preclude State regulation. The defendants in *LCO* are primarily State officials who are being sued in both their individual and representative capacities. On cross-motions for summary judgment, the district court granted the defendants' motion, reasoning that the Indians' usufructuary rights were released or extinguished by the Treaty of September 30, 1854 (Treaty·of 1854).[1] In reaching this conclusion, the district judge expressly rejected the State's contention that the usufructuary rights had been revoked by the Executive Order of February 6, 1850 (Removal Order of 1850).

*United States v. Wisconsin & Sawyer County (Ben Ruby),* which has been consolidated with *LCO* for purposes of appeal, similarly involved a determination by the district judge, on cross-motions for summary judgment, that the Removal Order of 1850 was invalid. The State has cross-appealed the district court's holding pertaining to the Removal Order of 1850 in both *LCO* and *Ben Ruby.*[2]

*LCO* and *Ben Ruby* were decided by the district court, together with a third Indian rights case that is not involved in this appeal. The cases are reported as *United States v. Bouchard,* 464 F.Supp. 1316 (W.D. Wis.1978).

The three principal issues presented by *LCO* and *Ben Ruby* are:

* Paul C. Weick, Senior Circuit Judge for the Sixth Circuit, sitting by designation.

1. Because of the district judge's conclusion that the Indians' usufructuary rights were released or extinguished in 1854, his disposition of *LCO* does not reach the issue of what regulations the State might impose on the Indians' usufructuary activities if those rights were still in force.

2. The United States dismissed its own appeal from the *Ben Ruby* decision and the LCO band did not move to intervene to protect its interests on the cross-appeal in *Ben Ruby.*

(1) what was the nature of the usufructuary rights enjoyed by the LCO band pursuant to the treaties of 1837 and 1842;

(2) whether those rights were extinguished by the Removal Order of 1850; and if not,

(3) whether those rights were released or extinguished by the Treaty of 1854.

## I. FACTS

Because one of the subsidiary issues in these cases is whether they were appropriate for resolution by summary judgment, a rather detailed recitation of the evidence before the district court is required.

The LCO band was one of many bands of Chippewa Indians who lived in areas of northern Wisconsin, the Upper Peninsula of Michigan, and northeastern Minnesota. Together with several other bands, the LCO band was referred to as "Lake Superior Chippewas." The Chippewa bands subsisted mainly by hunting, fishing, trapping, harvesting wild rice, making maple sugar, and engaging in various gathering activities.

During at least the first half of the nineteenth century, the policy of the federal Government was to buy Indian lands where white settlement was anticipated and to provide for removal of the Indians to lands farther west. This is called the "removal policy."

In 1837, Wisconsin Territorial Governor Henry Dodge was authorized to negotiate a treaty with the Chippewas for the purchase of land in northern Wisconsin, just south of the Lake Superior basin. On March 3, 1837, Congress appropriated $10,000 for "holding treaties with the various tribes of Indians east of the Mississippi River, for the cession of lands held by them ... and for their removal west of the Mississippi." 5 Stat. 158, 161. On May 13, 1837, the Office of Indian Affairs wrote Treaty Commissioner Dodge concerning the Government's purposes in seeking a treaty at that time. The letter indicated that the land was valuable for its pine timber and that acquisition by the United States would open the territory for white settlement.

A treaty council was held. According to the notes of Verplanck Van Antwerp, secretary of the council, Commissioner Dodge told the assembled Indian chiefs in July 1837 that the Government wished to buy a portion of their land that was barren of game and not suited for agriculture. Dodge described the land sought as "abound[ing] in pine timber, for which their Great Father the President of the United States wished to buy it from them, for the use of his white children." The Indians responded that they wanted to be able to continue their gathering and hunting activities on the lands, that they wished annuities for sixty years, after which their grandchildren could negotiate for themselves, and that they desired provisions for the half-breeds and traders. Governor Dodge pointed out to the Indians that the "Great Father" never buys lands for a term of years, but that he would agree on behalf of the President to grant the Indians the "free use of the rivers, and the privilege of hunting upon the lands you are to sell to the United States during his pleasure."

The following day the Indians reiterated, through their spokesman Aish-ke-bo-gi-ko-she, that they wished to reserve the privilege of using the land for gathering, hunting, and fishing activities. They said that they could not live, deprived of these means of sustenance. Commissioner Dodge replied, in part: "I will make known to your Great Father, your request to be permitted to make sugar, on the lands; and you will be allowed, during his pleasure, to hunt and fish on them. It will probably be many years before your Great Father will want all these lands for the use of his White Children." [3]

The Treaty of 1837, which was signed by a Lac Courte Oreilles chief, among others, embodied these understandings. Article 1

---

**3.** The land ceded to the United States by the Treaty of 1837 is illustrated in Appendix A to the district court opinion, at 464 F.Supp. 1316, 1362–63 (W.D.Wis.1978). The present Lac Courte Oreilles reservation is within the ceded territory.

of that Treaty states that the Chippewas "cede to the United States all that tract of country" described in the article. The United States agreed to pay annuities to the Indians, to distribute money to the half-breeds, and to pay some Indian debts. Article 5 of the Treaty states:

The privilege of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied [sic] to the Indians during the pleasure of the President of the United States.

In 1841, Congress appropriated $5,000 for the expenses of negotiating a treaty to extinguish Indian title to lands in Michigan, a portion of which was held by the Chippewa bands. In July 1842, Robert Stuart, Superintendent of the Michigan Indian Agency wrote to the Secretary of War. He stated that, subsequent to the 1841 appropriation, it had been learned that the mineral district Congress wished to acquire extended beyond northern Michigan into Wisconsin. He recommended purchase of the Wisconsin as well as the Michigan land, stating that "the main importance of immediately acquiring this territory, is owing to its supposed great mineral productivity." He noted that it would not be necessary to remove the Indians from the land until the land was required for white settlement. A month later, Stuart was appointed commissioner to negotiate the proposed treaty with the Chippewas. His instructions stressed the importance of gaining the mineral lands and acquiring control over the south shore of Lake Superior. He was told that general removal of the Indians from the territory would not occur for "considerable time."

Stuart reported the outcome of his negotiations with the Chippewas in an annual report to the Bureau of Indian Affairs dated October 28, 1841. He noted the importance of the mineral deposits on the land and indicated that the concluded treaty had arranged a sharing of annuities between the Lake Superior tribes and the Mississippi tribes. This sharing was necessary to end a feud that had developed between the tribes after the 1837 treaty.

The 1842 treaty included a cession of land north of that ceded in 1837.[4] Article II of the Treaty of 1842 stated:

The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.

The December 5, 1842, report on the treaty by the Commissioner of Indian Affairs to the Secretary of War stressed the importance of acquiring the minerals and of commanding the south shore of Lake Superior. A report by the Superintendent of the Wisconsin Indians to the Commissioner of Indian Affairs the following year noted that exclusive possession of the Lake Superior shore would be commercially important, especially as settlements and mineral trade expanded.

Copper mining along the south shore of Lake Superior, as well as white settlement on the ceded areas, increased greatly following the Treaty. As early as 1846, the Commissioner of Indian Affairs again suggested that the Chippewas be removed to land set apart for them west of the Mississippi. The reports of the period indicate that the Commissioner envisioned "improvement of the Indian race" by decreasing their reliance on traditional activities such as hunting and fishing and by compelling them to "resort to agriculture and other pursuits of civilized life." The fact that whites were selling whiskey to the Indians was seen as another reason for removal.

During the summer of 1847, two Government agents attempted to secure Chippewa agreement to a plan of resettlement. They were unsuccessful. In 1847, the Commissioner of Indian Affairs again suggested that resettlement was desirable. His report did not mention conflicts between the Indians and whites. The LaPointe subagent

---

4. *See* Appendix A to district court disposition, 464 F.Supp. 1316, 1362–63 (W.D.Wis.1978).

was more specific. He recorded two incidents of violence between the Chippewas and white settlers. In one, an Indian was acquitted of a murder charge on the ground of self-defense. In the other, the investigating agent concluded that the whites were at fault. The Commissioner wrote:

> I fear, that in our accounts of outrages and crime, we have done the Chippewas, if no other tribe, injustice in many cases; for I find on comparing them with almost any civilized community of the same size, for four years, there will be found the smaller aggregate of crime on the part of the savage; and every crime of any magnitude which has been committed may be traced to the influence of the white man.

In his 1848 Report, the Commissioner noted that, although most other Wisconsin tribes had been removed, the Chippewas remained in Wisconsin. The Commissioner stressed the desirability of "civilizing" the Indians by requiring them to settle on smaller grounds where they would have to rely on agriculture. No conflicts between Indians and whites were reported.

The 1849 Report of the Commissioner of Indian Affairs again repeated the reasons for removal stressed in earlier years. Additionally, he referred to white "citizens who suffer annoyance and loss from depredations." The report of the LaPointe sub-agent for 1849 had specifically addressed this problem and had concluded that the sale of whiskey by the whites to the Indians was causing the most difficulty. The sub-agent acknowledged that it was possible the Indians were punished for acts they committed whereas whites who committed similar acts went free.

In 1849, the Lake Superior Chippewas petitioned Congress for twenty-four sections of land at "LaCotore" and at "La-Point." They indicated that they wanted the land for permanent cultivation and permanent homes. Further, in October of that year, the Legislative Assembly of the Minnesota Territory requested the President to remove the Chippewas to another unsettled area.

At the urging of the Commissioner of Indian Affairs and the Secretary of the Interior, the President issued an executive order on February 6, 1850. This Order stated in relevant part:

> The privileges granted temporarily to the Chippewa Indians of the Mississippi, by the fifth article of the treaty made with them on the 29th of July 1837 "of hunting, fishing and gathering the wild rice upon the lands, the rivers and the lakes included in the territory ceded" by the treaty to the United States, and the rights granted to the Chippewa Indians of the Mississippi and Lake Superior by the second article of the treaty with them of October 4th, 1842, of hunting on the territory which they ceded by that treaty, with the other usual privileges of occupancy until required to remove by the President of the United States, are hereby revoked and all of the said Indians remaining on the lands ceded as aforesaid, are required to remove to their unceded lands.

The Indians were surprised and dismayed by the order. Benjamin Armstrong, a trader who lived in Chippewa territory and reported in a book his experiences with the Indians wrote:

> No conversation that was held [during the 1842 treaty negotiations] gave the Indians an inkling or caused them to mistrust that they were ceding away their lands, but supposed that they were simply selling the pine and minerals, as they had in the treaty, of 1837, and when they were told in 1849, to move on and thereby abandon their burying grounds—the dearest thing to an Indian known—they began to hold councils and to ask each as to how they had understood the treaties, and all understood them the same, that was: that they were never to be disturbed if they behaved themselves.

B.G. Armstrong, Early Life Among the Indians 12 (1892). Armstrong also reported that the Indians' attempts thereafter to learn of any depredations which could have been the cause of removal were unsuccessful. In short, the Indians believed they would not be removed unless they misbe-

haved and they found no evidence of misbehavior.

This understanding was repeated in a letter written to the white settlers in Minnesota by a Chippewa chief in 1850. He stated that the treaty commissioner had told the Indians in 1842 that they would not be removed for at least 20 years and probably never. The chief indicated that the treaty had been signed on the reliance that it was only the copper on the land that was sought by the United States. A letter written January 21, 1851, from the Secretary of the American Board of Commissioners for Foreign Missions informed the Commissioner of Indian Affairs that the Indians had been told they could remain where they were for an indefinite period, "except so far as they might be required to give place to miners; and the Commissioner said to them: 'You and I shall never see the day when your Great Father will ask you to remove.'" The Secretary indicated that, absent that promise, the treaty would never have been signed. The Secretary's version of the treaty was corroborated by several sources including C. Mendenhall, a miner who wrote to the Commissioner of Indian Affairs on January 6, 1851, W.W. Warren, a farmer who was employed by the Government to teach farming to the Indians, and Indian Agent Henry Gilbert in his 1853 report to the Commissioner of Indian Affairs.

A further effort to effect removal to the western lands was made in 1850 by changing the place for payment of the Chippewas' annuities from LaPointe to Sandy Lake in the Minnesota Territory. The trip resulted in the death of many Indians. The following February 1851, subagent Watrous suggested paying the annuities in early spring and late fall in the Minnesota Territory. He hoped that this would be more effective in inducing the Indians to stay at Sandy Lake. Watrous was subsequently appointed superintendent of removal.

On August 24, 1851, Indian Commissioner Lea of the Office of Indian Affairs advised Watrous by telegram to "Suspend action with reference to the removal of Lake Superior Chippewas for further orders." On September 5, 1851, Lea confirmed that the suspension had been ordered by the Secretary of the Interior, pending the President's decision as to whether the Indians would be permitted to remain on their lands.

Also in September 1851, Assistant Superintendent Boutwell reported to the Minnesota Territorial Governor concerning the problems encountered in trying to effect removal of the Chippewas. Boutwell reported that a compromise had been achieved concerning the place for payment of annuities and indicated that, despite the telegram suspending removal operations, "as the Indians are ready to go I shall start them."

On September 20, 1851, Watrous reported to the Territorial Governor that 900 Chippewas remained on the ceded lands. He expressed apprehension that those who had been removed would return. These observations were reported to the Commissioner of Indian Affairs in Superintendent Ramsey's annual report dated November 27, 1851.

In the meantime, Chippewa Chief Buffalo had written the Commissioner on November 6, 1851, complaining about the hardship caused by the removal attempts and particularly the designation of where the annuities were paid. He requested that all future payments be made at LaPointe.

The Indians were dissatisfied with the provisions given them during the winter of 1851. On April 5, 1852, a group of Chiefs went to Washington to see the President. They were accompanied by Benjamin Armstrong who subsequently reported much that transpired. According to Armstrong, on June 12, 1852, Chief Buffalo dictated a memorial to President Fillmore. He again expressed his understandings that treaty annuities were to be paid at LaPointe and that the Indians were to be permitted to remain on their lands for "one hundred years to come." The Chief beseeched the President and his agents to honor the Treaty of 1842 as the Indians understood it. President Fillmore told the delegation that he would countermand the Removal Order of 1850 and that annuity payments would

henceforth be made at LaPointe. He gave Chief Buffalo a written instrument explaining these promises. The delegation returned home. There is apparently no current record of the President's explicit contravention of the removal order.

There is some inconsistency in reports as to what transpired thereafter. Armstrong reported that the annuities for 1852 were paid at LaPointe, that the President's letter was explained to Chief Buffalo and that the Chief also stated that there was yet one more treaty to be made with the President, "and that he hoped in making it they would be more careful and wise than they had heretofore been and reserve a part of their land for themselves and their children." Armstrong, *supra,* at 32.

In his October, 1852 report, however, Superintendent Ramsey reported that the Chippewas had been told there would be no further payment of annuities upon ceded land. Ramsey stated that limiting annuities to those Indians who had removed was the best way to further the removal goal.

Armstrong's report that the 1853 and 1854 annuity payments were made at LaPointe was corroborated by a report of Indian Agent Henry Gilbert. Gilbert reported that the Indians would "sooner submit to extermination than comply with [the Removal Order]." Further, he reported that the whites and Indians were living harmoniously.

In the annual report of the Office of Indian Affairs dated November 24, 1854, the Commissioner noted that some bands of Lake Superior Chippewa were still living on the lands ceded by the treaties of 1837 and 1842. He stated: "It has not, thus far, been found necessary or practicable to remove them." He observed that:

[I]t may be necessary to permit them all [the Chippewas] to remain, in order to acquire a cession of the large tract of country they still own east of the Mississippi, which, on account of its great mineral resources, it is an object of material importance to obtain. They would require but small reservations; and thus permanently settled, the efforts made for their improvement will be rendered more effectual.

The reservation idea was apparently acceptable to the white settlers of Wisconsin. In February, 1854, of that year the Wisconsin legislature sent a memorial to the President and Congress. This memorial noted that the "Chippewa Indians in the region of Lake Superior are a peaceable, quiet, and inoffensive people, rapidly improving in the arts and sciences; that they acquire their living by hunting, fishing, manufacturing maple sugar, and agricultural pursuits." The memorial requested the President to rescind the prior Removal Order and to guarantee the payment of annuities to the Indians at LaPointe. The memorial also requested laws to "encourage the permanent settlement of those Indians as shall adopt the habits of the citizens of the United States."

In a letter dated August 11, 1854, the Indian Affairs Commissioner directed agent Gilbert to attempt to reach a treaty with the Chippewas, extinguishing their title to lands in Minnesota and Wisconsin. Gilbert was authorized to reserve 748,000 acres for permanent homes of the Indians in areas which did not include mineral lands and which were out of the path of white settlement.

The Indians requested Armstrong to be the interpreter, expressing their conclusion that interpreters at other treaty negotiations had made mistakes. Armstrong recorded Chief Buffalo as saying, in part:

We do not want to be deceived any more as we have in the past. We now understand that we are selling our lands as well as the timber and that the whole, with the exception of what we shall reserve, goes to the great father forever.

Armstrong, *supra,* at 38.

The Treaty of LaPointe was concluded September 30, 1854. It provided that the Lake Superior Chippewas living in Minnesota ceded their territory to the United States. These Minnesota bands were granted usufructuary rights on the ceded land pursuant to Article 11. Article 2 speci-

fied that the United States agreed to withhold from sale, for the use of the Chippewas, certain described tracts of land. One was set aside for the LCO band. The treaty provided that the boundaries would thereafter be fixed under the direction of the President. Other Articles of the treaty provided for annuity payments, provisions for half-breeds and traders, the provision of various hunting devices and ammunition to the Indians, a ban on spirituous liquors, and a promise that the Indians would not be removed from the homes permanently set apart for them.

Even after the reservation boundaries were settled, many Chippewa Indians continued to roam throughout the ceded area, engaging in their traditional pursuits.

## II. STANDARD OF REVIEW ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

■ A preliminary issue raised by the parties involves the proper scope of review by this court when a case has been decided on cross-motions for summary judgment. The defendants urge essentially that the lower court proceeding be viewed as a bench trial involving documentary evidence. They assert that the district judge was empowered to decide questions turning on factual inferences, that at least "some deference" must be accorded the findings of the trial judge, and that no appellate presumptions against the judgment should apply.

The tribe, by contrast, asserts that on review all inferences of fact must be viewed in the light most favorable to the appellant and that summary judgment is inappropriate if the judgment requires the resolution of competing factual inferences.

There is authority for the general proposition urged by the defendants. In *Tripp v. May,* 189 F.2d 198 (7th Cir.1951), this court held that " '[i]n a nonjury case if both parties move for summary judgment and the court finds that there are issues of fact but that the facts have been fully developed at the hearing on the motions, the court may proceed to decide the factual issues and give judgment on the merits. This of course amounts to a trial of the case and is not technically a disposition by a summary judgment.' " *Id.* at 200 (quoting 3 Barron & Holtzoff § 1239); *accord, Nielsen v. Western Electric Co.,* 603 F.2d 741, 743 (8th Cir.1979); *Starsky v. Williams,* 512 F.2d 109, 113 (9th Cir.1975); 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2720, at 466 (1973). When the hearing on cross-motions is in fact a trial, the factual findings of the district court will be overturned only if they are clearly erroneous, *e.g., Starsky,* 512 F.2d at 111.

It is important to remember, however, that cross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist. *Starsky,* 512 F.2d at 112; *accord, Manetas v. International Petroleum Carriers, Inc.,* 541 F.2d 408, 413 (3d Cir.1976); *Hartford Accident & Indemnity Co. v. Northwest National Bank of Chicago,* 228 F.2d 391, 395 (7th Cir.1955). The parties in both *Nielsen,* 603 F.2d at 743, and *Tripp,* 189 F.2d at 200, had *expressly* stipulated to an agreed set of facts and in *Starsky,* the parties had ample notice that the trial judge believed they had "in effect" so stipulated, 512 F.2d at 113.

In the instant case, the record suggests that the tribe did not stipulate to a trial based on the documents before the court. The district judge was well aware that a Rule 56 disposition was precluded if genuine issues of material fact existed and the tribe indicated that if summary judgment were not granted they would call expert witnesses at trial. We are reluctant, therefore, to apply the reasoning in *Tripp* and *Starsky* to the instant case.

We therefore apply the traditional standard that summary judgment will not lie unless, construing all inferences in favor of the party against whom the motion is made, no genuine issue of material fact exists. *Pharo v. Smith,* 621 F.2d 656, 664 (5th Cir. 1980), *remanded on reh'g on other grounds,* 625 F.2d 1226 (5th Cir.1980). As recognized by the *Pharo* court, however, only inferences that follow *reasonably* from the evidence need be considered. *Id.*

Relatively few aspects of this case turn on what could be characterized as factual questions. Relevant issues which might be so classified are: (1) the Indians' understanding of the qualifying language in the Treaties of 1837 and 1842, and (2) whether the Indians "misbehaved" prior to 1850. Rather than considering the appropriateness of summary judgment on these specific questions at this point in our discussion, we consider each issue, *infra,* applying the standard enunciated above.

## III. CANONS OF CONSTRUCTION PERTINENT TO INDIAN LAW

■ First, the Supreme Court has held that Indian treaties must be construed as the Indians understood them.[5] In *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 528, 8 L.Ed. 483 (1832) (McLean, J., concurring), the Court stated:

> The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense.... How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.

In *Jones v. Meehan,* 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899), the Court stated that a "treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." The Supreme Court has applied this canon of construction because the Indians and the Government were not bargaining from positions of equal strength, *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 90, 30 L.Ed. 306 (1886); the treaties were drawn up by representatives of the United States in a written language unfamiliar to the Indians, *Jones v. Meehan,* 175 U.S. 1, 10–11, 20 S.Ct. 1, 4–5, 44 L.Ed. 49 (1899); the Indians' comprehension of treaty terms depended on interpreters employed by the Government, *id.;* and, finally, because the Indians were unfamiliar with the legal manner of expression, *id.* For all these reasons, Indian treaties must be construed as the Indians understood them. *E.g., Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334–35, 25 L.Ed.2d 615 (1970); *Choctaw Nation v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 492 (1943); *Tulee v. Washington,* 315 U.S. 681, 684–85, 62 S.Ct. 862, 864–65, 86 L.Ed. 1115 (1942); *United States v. Shoshone Tribe,* 304 U.S. 111, 116, 58 S.Ct. 794, 797, 82 L.Ed. 1213 (1938).

A second—and related—rule of construction is that ambiguous words and phrases in Indian treaties have been resolved in favor of the Indians. *Arizona v. California,* 373 U.S. 546, 599–601, 83 S.Ct. 1468, 1497–98, 10 L.Ed.2d 542 (1963); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918); *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908). This rule is particularly applicable if the language of a treaty supports two inferences, one favoring the Indians and one the Government. *Winters,* 207 U.S. at 575–77, 28 S.Ct. at 211–12. As stated by the *Winters* Court:

> On account of their relations to the Government, it cannot be supposed that the Indians were alert to exclude by formal words every inference which might mitigate against or defeat the declared purpose of themselves and the Government even if it could be supposed that they had the intelligence to foresee the "double sense" which might some time be urged against them.

---

**5.** Although *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), deviated from this rule of construction, *Montana* was controlled by the long established presumption against conveyance of title to the bed of a navigable water, *United States v. Holt*

*State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926). The concerns critical to the *Montana* Court, state sovereignty and title to a navigable water bed, are not presented in the *LCO* case.

■ Taken together, these canons mandate that we adopt a liberal interpretation in favor of the Indians. We may consider the history of the treaty, the negotiations, and the parties' practical construction. *E.g., Choctaw Nation v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 492 (1943). Moreover, these same principles must be applied in construing an act of Congress that purports to extinguish treaty rights of the Indians. *E.g., United States v. Michigan,* 471 F.Supp. 192 (W.D. Wis.1979), *aff'd in relevant part,* 653 F.2d 277 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). Bearing these principles in mind, we turn to the major issues relevant to this appeal.

## IV. NATURE OF THIS TRIBE'S USUFRUCTUARY RIGHTS

The first principal issue relevant to the *LCO* appeal concerns the legal effect of the usufructuary rights enjoyed by the tribe pursuant to the Treaties of 1837 and 1842. Those rights derive in part from Article 5 of the Treaty of 1837 which states:

> The privilege of hunting, fishing and gathering the wild rice upon the lands, the rivers and the lakes included in the territory ceded, is guarantied [sic] to the Indians during the pleasure of the President of the United States.

Article II of the Treaty of 1842 similarly states:

> The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States.[6]

The Supreme Court precedent relating to Indians' rights has drawn a distinction between "aboriginal title" and "treaty-reserved title." *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 277–78, 285, 75 S.Ct. 313, 316–17, 320, 99 L.Ed. 314 (1955); *accord, United States v. Sioux Nation,* 448

U.S. 371, 415 n. 29, 100 S.Ct. 2716, 2740 n. 29, 65 L.Ed.2d 844 (1980). By analogy, aboriginal rights of use enjoy a different legal status than a treaty-recognized rights of use. *Compare United States v. Santa Fe Pacific Railroad,* 314 U.S. 339, 358, 62 S.Ct. 248, 257, 86 L.Ed. 260 (1941), *with Menominee Tribe v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968). For purposes of this appeal, the difference is significant in determining how explicit a subsequent Congressional enactment must be in order to abrogate the Indians' usufructuary rights.

The defendants in *LCO* have conceded that the tribe possessed treaty-recognized rights of use to the land ceded pursuant to the Treaties of 1837 and 1842. They suggest, however, that the qualifying treaty language pertaining to those rights eradicates any distinction from aboriginal rights for purposes of analysis.

### A. Aboriginal Title Versus Treaty-Recognized Title

Although "title" is not at issue on this appeal, an understanding of the legal distinction between aboriginal and treaty-recognized title provides a foundation for the discussion that follows.

■ Aboriginal title is the right of native people in the new world to occupy and use their native area. The United States' sovereign rights to the land within its borders was subject to the aboriginal title of the various Indian tribes. The United States could, however, extinguish aboriginal title at any time and by any means. The United States did not need to compensate the Indians for the taking of such title. Essentially, aboriginal title was title good against all but the United States. *E.g., Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 288–89, 75 S.Ct. 313, 321–22, 99 L.Ed. 314 (1955).

■ "Treaty-recognized title" is a term that refers to Congressional recognition of

---

**6.** Other courts have recognized that "the other usual privileges of occupancy" include the right to fish and engage in traditional gathering activities. *E.g., United States v. Michigan,* 471 F.Supp. 192 (W.D.Mich.1979), *aff'd in relevant part,* 653 F.2d 277 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981); *People v. LeBlanc,* 399 Mich. 31, 248 N.W.2d 199 (1976). That proposition is not challenged by the defendants in this case.

a tribe's right permanently to occupy land. It constitutes a legal interest in the land and, therefore, could be extinguished only upon the payment of compensation. *E.g., United States v. Sioux Nation,* 448 U.S. 371, 415 n. 29, 100 S.Ct. 2716, 2740 n. 29, 65 L.Ed.2d 844 (1980). The Supreme Court has made clear that abrogation of treaty-recognized title requires an explicit statement by Congress or, at least, it must be clear from the circumstances and legislative history surrounding a Congressional act. *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).

## B. Aboriginal and Treaty-Recognized Rights of Use

### 1. No Dependence on Right of Permanent Occupancy.

■ Both aboriginal and treaty-recognized title carry with them a right to *use* the land for the Indians' traditional subsistence activities of hunting, fishing, and gathering. Treaty-recognized rights of use, or usufructuary rights, do not necessarily require that the tribe have title to the land. For instance, in the seminal case of *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), the Yakima Indians had ceded, pursuant to the Treaty of 1859, to the United States all of their lands in Washington State except for a specifically reserved tract. The same treaty reserved to the Indians the " 'right of taking fish at all usual and accustomed places, in common with citizens of the Territory.' " *Id.* at 378, 25 S.Ct. at 663. One of the accustomed fishing sites of the Indians was the Columbia River. The land along the shores of the river was not included in the Indians' reservation. This land subsequently passed, pursuant to contracts and patents with the State of Washington, to the *Winans* defendants. The defendants were generally unwilling to let the Indians cross their lands to reach the river.[7]

The *Winans* Court characterized the Treaty of 1859 as "not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." *Id.* at 381, 25 S.Ct. at 664. Relying on this framework of analysis, the Court held that the "Indians were given a right in the land—the right of crossing it to the river— the right to occupy it to the extent and for the purpose mentioned." *Id.*

*Winans* illustrates a treaty-recognized right that was not dependent on either the Indians' title or right to occupy permanently the land in which it was to be exercised.

The scope of treaty-recognized non-reservation fishing rights was quite recently at issue before the Supreme Court in *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The *Fishing Vessel Association* case refers at length to the previous disposition in *Winans,* thus reaffirming that treaty-recognized rights of use depend neither on title nor right of permanent occupancy; rather, they are similar to a *profit à prendre. See Kennedy v. Becker,* 241 U.S. 556, 562, 36 S.Ct. 705, 707, 60 L.Ed. 1166 (1916); *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905).

### 2. Degree of Explicitness Required to Abrogate Rights.

The primary relevance of the distinction between aboriginal rights of use and treaty-recognized usufructuary rights to the instant case lies in the degree of explicitness required to abrogate such rights. Reflecting the ease with which Congress may extinguish aboriginal title, the Supreme Court required only an implicit abrogation of off-reservation usufructuary rights in *United States v. Santa Fe Pacific Railroad,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). In *Santa Fe,* the Walapai Indians held aboriginal title, as well as the related aboriginal rights of use, to their tribal lands. The Government had made several unsuccessful efforts to remove the Walapais and there had been repeated suggestions for settling

---

**7.** The defendants also obstructed the Indians' fishing, assuming the Indians had been able to reach the river, by the use of "fishing-wheels."

The *Winans* Court held that such obstruction was impermissible. 198 U.S. at 384, 25 S.Ct. at 665.

the tribe on a reservation. "[V]iolent problems," *id.* at 358, 62 S.Ct. at 257, existed between the Walapais and an increasing contingent of white settlers. In 1881, the Indians requested that they be settled on a reservation because white men were overrunning their other lands. In 1883, the Walapais' reservation was created. The Act by which the reservation was established made no explicit mention of whether the tribe retained any rights in the non-reservation lands.

The Supreme Court found that the off-reservation tribal rights were implicitly extinguished, stating:

> They were in substance acquiescing in the penetration of white settlers on condition that permanent provision was made for them too. In view of this historical setting, it cannot now be fairly implied that tribal rights of the Walapais in lands outside the reservation were preserved. That would make the creation of the 1883 reservation, as an attempted solution of the violent problems created when two civilizations met in this area, illusory indeed. We must give it the definitiveness which the exigencies of that situation seemed to demand. Hence, acquiescence in that arrangement must be deemed to have been a relinquishment of tribal rights in lands outside the reservation and notoriously claimed by others.

*Id.* at 358, 62 S.Ct. at 257 (citations omitted).

By contrast, the abrogation of treaty-recognized rights, like the extinguishment of treaty-recognized title, appears to require something more explicit. The parties disagree as to precisely what is required. Both parties, however, recognize the importance of *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), to this inquiry.

The Menominee Tribe had been granted a reservation in Wisconsin pursuant to the Treaty of Wolf River (1854), 10 Stat. 1064. As interpreted, this treaty included the traditional hunting and fishing rights on reservation land. 391 U.S. at 406, 88 S.Ct. at 1707. In 1954, Congress passed an act which, as amended, granted designated states, including Wisconsin, jurisdiction over offenses committed in specified areas of Indian country. Pub.L. No. 280, 67 Stat. 588 (1954) (codified as amended at 18 U.S.C. § 1162). That Act explicitly provided, however, that " 'Nothing in this section ... shall deprive any Indian or any Indian tribe, band, or community of any right, privilege or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.' " 391 U.S. at 410–11, 88 S.Ct. at 1709–10 (quoting Pub.L. No. 280, 67 Stat. 588 (1954) (codified as amended at 18 U.S.C. § 1162)). That same year, Congress passed the Menominee Indian Termination Act of 1954, 68 Stat. 250 (codified as amended at 25 U.S.C. §§ 891–902). The Termination Act provided for the withdrawal of federal supervision over the members and property of the tribe. The reservation became a Wisconsin county and a Wisconsin corporation was formed to hold the property of the tribe. The Act provided that, after the termination of federal supervision, the laws of the State would apply to the tribe and its members. 391 U.S. at 410, 88 S.Ct. at 1709. The Termination Act became fully effective in 1961. In 1962, Wisconsin declared that the Menominees were subject to state hunting and fishing regulations. The state prosecuted three Indians for violating those regulations. The Wisconsin Supreme Court upheld the convictions, holding that the hunting and fishing rights of the Menominees had been revoked by the Termination Act.

The Menominees subsequently brought suit against the United States, claiming an entitlement to compensation for the extinguishment of their rights. The Supreme Court, upholding the Court of Claims, held that the Termination Act had not cancelled the Menominees' rights and that they could bring an injunctive suit against Wisconsin's disturbing their hunting and fishing rights. The Court concluded:

> We find it difficult to believe that Congress, *without explicit statement,* would

subject the United States to a claim for compensation by destroying property rights conferred by treaty, particularly when Congress was purporting by the Termination Act to settle the Government's financial obligations toward the Indians.

391 U.S. at 413, 88 S.Ct. at 1711 (footnotes omitted) (emphasis added).

The defendants contend that *Menominee* permits an implicit abrogation of treaty-recognized rights so long as there is "supporting evidence that the parties to the later legislation intended and understood that the extinguishment of rights would result." The tribe, by contrast, asserts that only an explicit Congressional statement permits cancellation of rights consistent with *Menominee.* We have stated the facts of *Menominee* at some length because we find merit in the defendants' assertion that the factual situation in that case is quite different from the instant case.[8]

*Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), a more recent Supreme Court case, is helpful in determining the scope of *Menominee.* In *Mattz,* the issue was whether the Act of June 17, 1892 should be read as an implicit termination of an Indian reservation that had been created by an earlier executive order. The Court held that the reservation was not terminated, stating: "A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Id.* at 505, 93 S.Ct. at 2258 (citations omitted).

Although *Mattz* dealt with cancellation of treaty-recognized title rather than treaty-recognized usufructuary rights, we believe the distinction is irrelevant to the determination as to how explicit a subsequent Congressional Act must be in order to extinguish Indians' treaty-recognized rights. An abrogation of treaty-recognized rights subjects the United States to a claim for compensation, *Menominee,* 391 U.S. at

404, 88 S.Ct. at 1705, 20 L.Ed.2d at 697, just as a rescission of treaty-recognized title does, *United States v. Sioux · Nation,* 448 U.S. 371, 415 n. 29, 100 S.Ct. 2716, 2740 n. 29, 65 L.Ed.2d 844 (1980). The *Menominee* Court found no explicit statement regarding cancellation of the tribe's hunting and fishing rights; further, it found such a termination inconsistent with the purpose of the Termination Act, 391 U.S. at 413, 88 S.Ct. at 1711, and with the Congressional intent evidenced by reading the Termination Act *in pari materia* with Public Law 280, *id.* at 410–11, 88 S.Ct. at 1709–10. We believe that the proper reading on *Menominee* is consistent with *Mattz:* a termination of treaty-recognized rights by subsequent legislation must be by *explicit* statement or must be *clear* from the surrounding circumstances or legislative history.

## C. Rights of the LCO Tribe Pursuant to the Treaties of 1837 and 1842

### 1. Implied Reservation.

Initially, we note that the tribe contends the Chippewas held treaty-recognized title to their lands pursuant to the Treaty of August 19, 1825, 7 Stat. 272 (Treaty of Prairie du Chien). They reason that this recognized title included the right to use the land for traditional pursuits and, that absent specific language in the Treaties of 1837 and 1842 extinguishing such rights, they were impliedly reserved to the Indians.

The state defendants assert that the Treaty of Prairie du Chien was not before the district court and should this court deem it relevant, a remand is essential. We do not believe a remand is mandated on that issue.

We need not rely on an implicit reservation of rights because the usufructuary rights of the LCO tribe were explicitly addressed in the Treaties of 1837 and 1842. *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), on which the

---

8. We do not agree with the defendants' suggestion, however, that the fact *Menominee* involved rights pursuant to a treaty granting a *reservation* makes that case inapposite to the

present appeal. The rights of use in that case were indeed originally tied to treaty-recognized title. Nonetheless, the usufructuary rights have independent significance.

appellants correctly rely as involving treaty-recognized usufructuary rights, does not appear to depend on any treaty prior to that in which the cession of land and simultaneous reservation of usufructuary rights were made. Although the tribe may indeed be correct in stating both that the Treaty of Prairie du Chien conferred recognized title on the tribe, *e.g., Minnesota Chippewa Tribe v. United States,* 19 Indian Cl. Comm'n 514, 524 (1968) (1837 treaty); *Minnesota Chippewa Tribe v. United States,* 19 Indian Cl. Comm'n 319, 330 (1968) (1842 treaty), and that usufructuary rights were implicitly reserved in later treaties, this line of analysis is not essential to our disposition of this case.

### 2. Explicit Reservation.

 Even though the parties agree that there was an explicit reservation of usufructuary rights in the two treaties, they disagree as to the impact of the qualifying language in the treaties: the statement in the Treaty of 1837 that the enumerated rights are guaranteed "during the pleasure of the President of the United States" and the language in the 1842 treaty indicating that the stipulated rights would endure until the Indians were "required to remove by the President of the United States." The limiting language raised two questions. The first is whether these *non-permanent* usufructuary rights recognized by treaty can be abrogated by a less explicit showing of intent than *permanent* treaty-recognized rights. The second is the meaning of the qualifying language in the two relevant treaties. We discuss each in turn.

The defendants strenuously urge that because the LCO's treaty-reserved usufructuary rights were "temporary," they could be extinguished by implication. The defendants support the district judge's characterization of the recognized rights as analogous to "permissive occupation" and rely on language in *Minnesota Chippewa Tribe v. United States,* 315 F.2d 906, 911 (Ct.Cl. 1963), and *Tee-Hit-Ton Indians v. United*

*States,* 348 U.S. 272, 278–79, 75 S.Ct. 313, 316–17, 99 L.Ed. 314 (1955). Essentially the defendants are arguing that non-permanent treaty-recognized rights are like aboriginal rights.

The term "permissive occupation" is more misleading than helpful in analyzing the case at bar. In *Tee-Hit-Ton Indians,* 348 U.S. at 278–79, 75 S.Ct. at 316–17 (1955), the Supreme Court employed the term in concluding that the rights of the Indian plaintiffs to Alaskan land were not legal rights and therefore no compensation was due for the taking of timber from those lands. The Court rejected the argument that treaty-recognized title had been conferred on the Indians by either of two Congressional acts, noting that the intention of those acts had been to "retain the *status quo* until further congressional or judicial action was taken." *Id.* at 278, 75 S.Ct. at 317 (footnote omitted). The "status quo" was the Indians' aboriginal title.

In *Minnesota Chippewa Tribe v. United States,* 315 F.2d 906, 911 (Ct.Cl.1963), the court's reference to "permissive occupation" was a direct quote from *Tee-Hit-Ton Indians,* and was relevant to the court's conclusion that the Indians indeed had recognized title to disputed land. As used in both *Tee-Hit-Ton Indians* and *Minnesota Chippewa Tribe,* "permissive occupation" is synonymous to aboriginal title.

The judge below first used the term "permissive occupation" in the *Ben Ruby* case, 464 F.Supp. at 1348, which was a quiet title action decided in the same opinion with the *LCO* case. He relied on *Mole Lake Band v. United States,* 139 F.Supp. 938 (Ct.Cl.1956), *cert. denied,* 352 U.S. 892, 77 S.Ct. 130, 1 L.Ed.2d 86. In *Mole Lake,* the Court of Claims had found that the intention of the parties to the cession Treaties of 1837 and 1842 was to pass title in the land to the United States and that the Indians were to have "only a revocable license to use the land until the President required them to vacate it." 139 F.Supp. at 940.[9]

**9.** As we discuss in more detail in Section V(B), *infra,* this finding is mere dicta in light of the actual disposition in the *Mole Lake* case. The

*Mole Lake* court did not use the term "permissive occupation."

We concur with the general proposition that if the Indians' right of occupancy is temporary, their interest in the land is more similar to a "revocable license" than it is to "title." Even so, we do not think it necessarily follows that an expressly granted revocable license to use land confers no greater rights than "aboriginal title" which carries no legal right at all against the United States, *Tee-Hit-Ton Indians,* 348 U.S. at 279, 75 S.Ct. at 317. Even in the context of the *Ben Ruby* case, therefore, the term "permissive occupation" would appear less than an exact statement of the rights enjoyed by the Indians.

The term "permissive occupation" is especially inapplicable, however, to the *LCO* case which involves the reservation of usufructuary rights rather than a claim of title. *Tee-Hit-Ton Indians, Ben Ruby, Minnesota Chippewa Tribe,* and *Mole Lake* all concerned questions of title. It is perfectly consistent with the basic tenets of property law that one may enjoy a *right of use* that is limited in duration. The fact that it is so limited makes it no less of a legal right.

We are not persuaded, therefore, that the rights of the LCO band pursuant to the Treaties of 1837 and 1842 were other than treaty-recognized rights of use which are of legal significance. Despite his use of the term "permissive occupation," the district judge apparently reached the same conclusion on this point. The fact that the rights enjoyed by the LCO band were legally enforceable against the United States compels the conclusion that they should not be extinguished by mere implication.

The second dispute between the parties concerns the meaning of the limiting language. "During the pleasure of the President" and "until required to remove by the President" would appear to confer unbridled discretion on the Government to extinguish the usufructuary rights. As the district court recognized, however, Indian treaties must ordinarily be construed as they were understood by the Indians. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832) (McLean, J., concurring); *accord, e.g., Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334–35, 25 L.Ed.2d 615 (1970); *see* Section III, *supra.*

The judge below found that the Chippewas understood the treaties to mean that they enjoyed the use of their lands for an unlimited time *unless they misbehaved by harassing white settlers.* In reaching this conclusion, the district judge relied on the Indians' statements during the negotiations preceding the Treaty of 1837 indicating that they wished to continue hunting and fishing on the ceded lands and that they envisioned their grandchildren negotiating for further annuities in sixty-years time. He also noted that both Indians and non-Indians present at the 1842 treaty negotiations later wrote that the Indians had been assured they would not have to remove unless they misbehaved.

The defendants challenge Judge Doyle's conclusion as going beyond his "discretion" and argue that both treaties were made pursuant to the removal policy which contemplated placing the Indians on lands farther west. They also argue that Judge Doyle should not have relied on the writings of persons present at the negotiations because this is evidence of "low quality."

The difficulty with the defendants' argument is that it does not really address what the *Indians* believed the treaty to mean. The fact that the treaties were conceived pursuant to a policy of "removal" is not inconsistent with either the assertion that the treaties were unacceptable to the Indians unless modified by an oral understanding that allowed them to stay on the land so long as they did not harass white settlers or the Government's recognition that this concession was therefore essential. Further, whether those persons who wrote of their recollections provided only "low quality" evidence for a trial over a hundred years later is somewhat irrelevant given that it is the *only* evidence of the *Indians' understanding* of the treaty.

One further point must be made although it is not explicitly argued by the defendants. A finding as to the "intent" of the Indians is arguably a factual finding that is inappropriate to a disposition by summary judgment. Because this aspect of the case was decided adversely to the defendants, we construe all inferences in favor of the defendants in determining whether a genuine issue of material fact exists. *Pharo v. Smith,* 621 F.2d 656, 664 (5th Cir.1980), *remanded on reh'g on other grounds,* 625 F.2d 1226 (5th Cir.). Because the defendant's evidence on this point does not address what the Indians believed the treaty to mean but, rather, the motive of the Government in seeking the treaty, we conclude that no genuine issue of fact existed.

We concur therefore in the district judge's conclusion that the qualifying language in the two treaties did not confer the unlimited discretion on the Executive that it appears to; rather, it required that the Indians be denied their usufructuary privileges only if the Indians were instrumental in causing disturbances with white settlers.

## D. Analogous Precedent

Two cases that involve a reservation of usufructuary rights by qualified treaty language support our conclusion that an abrogation of such rights should not be found without compelling evidence that such an extinguishment was intended. In both *United States v. Michigan,* 471 F.Supp. 192 (W.D.Mich.1979), *aff'd in relevant part,* 653 F.2d 277 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981), and *People v. LeBlanc,* 399 Mich. 31, 248 N.W.2d 199 (1976), Chippewa bands claimed the right to fish, free from State regulation, in portions of the Great Lakes. Pursuant to the Treaty of 1836, 7 Stat. 495, the tribes had ceded land to the United States. The treaty stated that: "The Indians stipulate for the right of hunting on the lands ceded, with the other usual privileges of occupancy, *until the land is required for settlement.*"

After concluding that the above-quoted language of Article XIII embraced the right to fish, *United States v. Michigan,* 471 F.Supp. at 259, *People v. LeBlanc,* 248 N.W.2d at 206, both courts addressed the question whether the rights had been extinguished by subsequent settlement of the land. The *LeBlanc* court found that the qualifying language was included in the treaty in order to allow white settlement of the land. Because the Great Lakes themselves weren't required for settlement the fishing rights were not terminated. 248 N.W.2d at 207. The *Michigan* court noted that the language of limitation was "ambiguous as to any definite period of Indian occupancy," 471 F.Supp. at 259, and relying on *LeBlanc,* concluded that the fishing rights were not terminated by operation of the language, *id.*

Both the *Michigan* and *LeBlanc* courts also rejected claims that the Treaty of 1855 had abrogated the treaty-recognized fishing rights. *United States v. Michigan,* 471 F.Supp. at 262–65; *People v. LeBlanc,* 248 N.W.2d at 210–12. In so concluding, both courts relied on the language in *Menominee* that is discussed *supra.* 471 F.Supp. at 262; 248 N.W.2d at 212.

The treaties relevant to the *Michigan* and *LeBlanc* cases are not identical to those before this court. We do not suggest that either *Michigan* or *LeBlanc* is dispositive of the instant controversy. It is important, however, that both the Michigan district court and the Supreme Court of that state found that "conditional" usufructuary rights could be abrogated only by an extremely strong showing that such was the intent of Congress. It is also significant that the courts were careful not to construe the language of limitation so as to prejudice the Indians.[10]

---

**10.** The defendants attempt to minimize the relevance of the *Michigan* case by stating that the Sixth Circuit rejected the rationale of the district court and followed instead the reasoning of the *LeBlanc* court. This argument is at best irrelevant and at worst tends to be misleading.

The district court in *Michigan* concluded that the State had *no* power to regulate Indian fishing because of the recognized treaty rights.

### E. Summary

A treaty is essentially a contract between two sovereign powers. *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979). It is not surprising, therefore, that the rule we find emerging from prior cases dealing with Indian rights is a rather straightforward statement of contract law. If the Government explicitly promised the Indians a property interest in land, the Government would be subject to a claim for compensation if it breached the terms of the agreement. If the United States promised a tribe that it would enjoy certain rights either for a specified period or until a specified event or events occurred, those rights were legally enforceable by the Indians. When the period expired or the contemplated event or series of events occurred, the rights could be extinguished by the Government without liability.

If the *LCO* case involved a property interest that by its very nature contemplated permanence, such as title, the argument of the defendants would be more persuasive. What was given the Indians pursuant to the Treaties of 1837 and 1842, however, was a right of use for a period, the duration of which was determined by the Indians' behavior.

If harassment of white settlers occurred, the Executive could extinguish the Indians' rights without the Government's incurring liability. If the Chippewas' rights were abrogated for any other reason, however, the Government would potentially be subject to a claim for compensation. An act of Congress should therefore be construed as extinguishing usufructuary rights only if the legislation expressly stated that such was the intent of Congress or if the legislative history and surrounding circumstances made clear that abrogation of treaty-recognized rights was intended by Congress.

## V. REMOVAL ORDER OF 1850

### A. Standing of Defendants to Cross-Appeal

The judge below held that neither the Removal Order of 1850 nor the Government's attempts forcefully to remove the Indians terminated the Chippewas' usufructuary rights. 464 F.Supp. at 1358–59. His reasoning, which was developed in the *Ben Ruby* portion of the combined opinion, *id.* at 1348–50, was as follows: (1) the Treaties of 1837 and 1842 permitted removal only if the Indians harassed white settlers; (2) the rec-

471 F.Supp. at 274. By contrast, the *LeBlanc* court found that certain State regulations would be permissible and carefully outlined the scope of such regulation. 248 N.W.2d at 212–15.

The Sixth Circuit twice considered the *Michigan* case. The first time, the case was remanded for a determination whether federal regulations regarding gill-net fishing preempted the field. In the context of reaching that disposition, the Sixth Circuit stated:

Although this Court has not finally decided the issue, it is inclined to the view ... [that] in the absence of federal regulations occupying the field, the Supreme Court of Michigan in *People v. LeBlanc, supra,* has correctly stated that applicable standard governing state regulation of gill-net fishing.

*United States v. Michigan,* 623 F.2d 448, 450 (6th Cir.1980) (per curiam). It is clear that the aspect of the district court's disposition that was not wholly endorsed by the Sixth Circuit was the *permissible scope of state regulation.*

Because of Judge Doyle's conclusion that the LCO's treaty rights were extinguished in 1854,

the permissible scope of regulation in the face of treaty-recognized rights was not decided below. It is not before this court on appeal. We fail to see what relevance the Sixth Circuit's favorable reference to the *LeBlanc* decision has to the instant controversy.

Concerning the issues in *Michigan* and *LeBlanc* that *are* relevant to this case, the Michigan district court and the state court reached the same conclusion: that treaty-recognized usufructuary rights are not to be found abrogated by implication and that the rights at issue in those cases were still viable. In its latest consideration of *Michigan,* the Sixth Circuit affirmed this view, stating: "The treaty-guaranteed fishing rights preserved to the Indians in the 1836 Treaty, including the aboriginal rights to engage in gill-net fishing, continue to the present day as federally created and federally protected rights." *United States v. Michigan,* 653 F.2d 277, 279 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981).

ord failed to disclose the kind of serious misbehavior that would have justified removal under the terms of the two treaties; (3) the Removal Order of 1850 was not authorized by the two earlier treaties and was therefore without legal effect because it was beyond the scope of the President's powers. *Id.* at 1350.

■ The defendants have cross-appealed in both *Ben Ruby* and *LCO* from the district court's finding of invalidity. The tribe has moved to dismiss the defendants' cross-appeal on the ground that the defendants are not "aggrieved parties" and therefore lack standing to appeal. There is no doubt that the defendants are entitled to urge before this court as an alternative basis for upholding the summary judgment granted below that the 1850 Removal Order was valid and extinguished the Chippewas' usufructuary rights. It is well established that a grant of summary judgment may stand if a reviewing court finds any sufficient basis for the judgment in the record. *Helvering v. Gowran,* 302 U.S. 238, 245–46, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937); *Miller v. Gateway Transportation Co.,* 616 F.2d 272, 275 n. 7 (7th Cir.1980); 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2716, at 440 (1973).

Because we conclude that the Treaty of 1854 does not support the disposition reached by the district judge, *see* Section VI, *infra,* the defendants' argument pertaining to the 1850 Removal Order must be considered by this court. As a result, whether those arguments are considered a cross-appeal or merely as an alternative ground for affirmance has no effect on the course of our opinion or the disposition of this case. We therefore will assume, without so deciding, that the defendants are aggrieved parties who have standing to challenge the findings of the judge below as to the Removal Order.

**B. Preclusive Effect of Mole Lake or Gunroe Cases**

Each party to this controversy contends that the question whether the 1850 Removal Order was valid has been previously determined and that the doctrines of res judicata or collateral estoppel preclude consideration of the question in this action. We first discuss the defendants' contention that *Mole Lake Band v. United States,* 139 F.Supp. 938 (Ct.Cl.), *cert. denied,* 352 U.S. 892, 77 S.Ct. 130, 1 L.Ed.2d 86 (1956), establishes that the Removal Order was valid and bars litigation of that issue in the present case.

**1. Res Judicata: *Mole Lake.***

In *Mole Lake,* three bands of Lake Superior Chippewa Indians, including the LCO, sued the United States. The complaint alleged that in creating their reservations the United States purported to convey to the Indians an area of land that the federal Government had previously conveyed to the State. As a result, the Indians had allegedly been deprived of some of the lands within their reservations as well as the proceeds from the timber cut from these lands. The court notified Wisconsin of its right to intervene. The State did so, asserting its ownership of the swamplands in question and the right to proceeds therefrom. The State also reserved its rights to challenge the jurisdiction of the district court over both the subject matter of the litigation and over the State in its sovereign capacity.

Because of the State's reluctance to submit to the court's jurisdiction, the *Mole Lake* court declined to consider the State's position unless it was critical to the resolution sought between the Indians and the federal Government. The holding of the *Mole Lake* court was that the United States was obligated by the treaty creating the reservations to secure the enjoyment of the lands and the proceeds therefrom to the Indians. *Id.* at 941. "Whether or not the State of Wisconsin ever has owned or does now own the swamp lands in the reservations is immaterial to the question of the obligation of the United States to the Indians, under the Treaty of 1854." *Id.* Because of this resolution, adjudication of the State's intervenor petition was unnecessary and the petition was accordingly dismissed by the court. *Id.*

The doctrine of res judicata bars a subsequent suit between the same parties or their privies based on the same cause of action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); *accord, Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Considering the limited role played by the State of Wisconsin in *Mole Lake,* and the court's express dismissal of the State's petition without adjudication, we cannot conclude that the State was a party to *Mole Lake* in the sense envisioned by the *Parklane* Court. Further, the cause of action in *Mole Lake* differs from that in the instant case. Neither the issue framed by the parties in *Mole Lake* nor the court's holding required consideration of the 1850 Removal Order. Although the judge discussed the Removal Order in the context of the historical events which culminated in the grant of the reservations lands in 1854, 139 F.Supp. at 939, he neither expressed nor had reason to consider the *validity* of the Removal Order.[11] We conclude therefore that *Mole Lake* is not a bar to consideration of the validity of the 1850 Removal Order in the instant case. We next address the tribe's contention that *State v. Gunroe,* 53 Wis.2d 390, 192 N.W.2d 892 (1972), is determinative of this issue pursuant to the doctrine of collateral estoppel.

2. Collateral Estoppel: *State v. Gunroe.*

We note initially that the defendants moved this court, prior to oral argument, to strike all references in the plaintiffs' combined responsive brief to the collateral estoppel argument premised on *Gunroe.* The defendants contend that the issue was not properly raised before the district court. Because this motion was not decided prior to oral argument and subsequent consideration of this case, the panel has considered the collateral estoppel argument. We have found it to be unpersuasive for the reasons indicated below. We conclude that,

in light of the fact the argument did receive consideration in due course, the motion to strike should be denied and the collateral estoppel issue should be disposed of on its merits.

"Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination .is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

In *Gunroe,* the Wisconsin Supreme Court considered the charges that certain enrolled members of two bands of Lake Superior Chippewa Indians had violated Wisconsin law by gill-net fishing and fishing without a license in Lake Superior. The Indians defended on the ground that their right to fish in Lake Superior was guaranteed by the Treaty of 1854 which had established their reservations. The Treaty of 1854 made no explicit reference to whether the right to fish in Lake Superior existed. In finding that the Indians enjoyed the claimed rights, the *Gunroe* court reasoned that because Lake Superior was a traditional Chippewa fishing ground, the Indians would have assumed when they signed the 1854 Treaty that the "right to fish" granted them was not limited to the waters of their reservations but also included Lake Superior. 192 N.W.2d at 901.

The *Gunroe* court did discuss the State's contention that the 1850 Removal Order abrogated whatever fishing rights the Indians had, as well as the Indians' response that the 1850 Order did not revoke fishing rights because it was never enforced. The court apparently reasoned that the 1850 Order was relevant because if the Indians' fishing rights had then been revoked, the Chippewas' claim that Lake Superior had been their traditional hunting ground since the Sixteenth Century, and therefore was implicitly recognized in the 1854 Treaty,

---

**11.** The doctrine of collateral estoppel similarly does not preclude litigation of the validity of the 1850 Removal Order because the validity of that order was not at issue in *Mole Lake. See*

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).

would be less forceful. *See id.* at 900. The Wisconsin court concluded that the 1850 Order "did not result in an actual revocation of fishing rights," *id.*, and that it had no effect upon the rights granted by the 1854 Treaty.

We do not believe that *Gunroe* precludes the State from urging the validity of the 1850 Order in the instant case. It is questionable whether any consideration of the Removal Order was "necessary," *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979), to the *Gunroe* holding. To the extent the Order was deemed relevant by that court, it was in the limited context of determining whether issuance of the Order had actually curtailed the Chippewas' use of Lake Superior as a fishing ground. The validity of the Removal Order was not in issue. We therefore conclude that the defendants are not precluded from relying on the 1850 Removal Order in the instant appeals.

In light of this conclusion, we do not address the other arguments urged by the defendants as to why the doctrine of collateral estoppel is inapplicable to this controversy. In so doing, we imply no view whatsoever as to the merits of those arguments.

### C. Validity of 1850 Removal Order

■ Congress has plenary authority over Indian affairs. *E.g., Warren Trading Post v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). This power is rooted in the treaty power, U.S. Const. art. II, § 2, cl. 2, and the Indian commerce clause, *id.* at art. I, § 8, cl. 3. *E.g., White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

■ An executive order cannot exceed the scope of the authority delegated by Congress. *Cole v. Young,* 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Marks v. CIA,* 590 F.2d 997, 1003 (D.C.Cir. 1978); *Independent Meat Packers Association v. Butz,* 526 F.2d 228, 235 (8th Cir. 1975), *cert. denied,* 424 U.S. 966, 96 S.Ct.

1461, 47 L.Ed.2d 733 (1976). The President cannot, therefore, purport to implement a treaty by action which in fact exceeds the limits of that treaty. *See Cole v. Young,* 351 U.S. 536, 557, 76 S.Ct. 861, 873, 100 L.Ed. 1396 n. 20 (1956).

■ As stated in Section IV(C)(2), *supra,* we concur with the district judge's conclusion that the Treaties of 1837 and 1842 authorized termination of the Chippewas' right to exercise their usufructuary privileges on ceded land *only* if the Indians misbehaved by harassing white settlers. The pivotal question relevant to the validity of the 1850 Removal Order is therefore whether the Indians had misbehaved.

This is arguably a question of fact. It was decided, in favor of the tribe, on a motion for summary judgment. Applying the standard set forth in Section II, *supra,* we can uphold the judgment below on this point only if, construing all inferences in favor of the defendants, there exists no genuine issue of material fact.

As early as 1846, the sale of whiskey to the Indians by white settlers was seen as a problem and a reason for removing the Indians. One could infer from this that Indian misbehavior existed; one could not reasonably conclude that the white settlers were blameless for whatever incidents occurred.

Two incidents of Indian violence were reported by the LaPointe subagent in 1847. In one, the Indian was found to have acted in self-defense; in the other, a white was found to be at fault. In the same report that discussed these incidents, the subagent concluded that "every crime of any magnitude which has been committed may be traced to the influence of the white man." In 1848, *no* conflicts between Indians and whites were reported by the Commissioner of Indian Affairs.

The 1849 Report of the Commissioner and the report of the LaPointe subagent for the year 1849 discussed disturbances caused by the Chippewa. Again, the sale of whiskey was blamed and, additionally, the subagent suggested that the Indians were punished in situations where white settlers were not.

The question before the district court was whether the totality of these incidents created at least an inference that the 1850 Removal Order was a direct response to Indian misbehavior. In light of the fact that the Order of 1850 made no reference whatsoever to Indian disruptions and that the incidents themselves were relatively few in number and at least in part instigated by whites, we think Judge Doyle correctly concluded that no *genuine* issue of material fact existed as to whether those acts of misbehavior motivated the 1850 Removal Order.

Whatever policy or other reasons might have motivated the Removal Order, we concur in Judge Doyle's conclusion that the 1850 Order exceeded the scope of the 1837 and 1842 treaties and was therefore invalid.

## VI. TREATY OF 1854

 As a preliminary matter, we note that the tribe contends the Treaty of 1854 was before the district court for only the limited purpose of demonstrating a shift in the Government's policy from removing the Indians to providing them reservations. The defendants, not surprisingly, disagree. Our review of the pleadings suggests that this would be a difficult question to resolve, primarily because both parties framed their contentions in the broadest possible language.

At oral argument, the tribe asserted that it believed the appeal could be resolved without remand on the subject of the 1854 treaty and that the Indians were urging a remand only as a secondary position. We believe that a resolution on the merits is possible and observe that it in no way prejudices the tribe.

Judge Doyle found that the Treaty of 1854, by which the Chippewa bands were granted reservations on portions of the land they had ceded to the Government in 1837 and 1842, extinguished the LCO's usufructuary rights on the remainder of the ceded land. As discussed in Section IV, *supra,* the Treaty of 1854 should be held to have abrogated these treaty-recognized rights only if the 1854 enactment expressly refers to termination of the usufructuary rights or if the circumstances and legislative history surrounding the treaty make clear that Congress intended such an abrogation. *See Menominee Tribe v. United States,* 391 U.S. 404, 415, 88 S.Ct. 1705, 1712, 20 L.Ed.2d 697 (1968). Because the Treaty of 1854 made no reference whatsoever to the usufructuary rights of the Chippewas who had previously ceded their territory to the United States, our analysis focuses on whether the circumstances surrounding the treaty compel the conclusion that termination of such rights was intended.

### A. Relationship Between Occupancy and Usufructuary Rights

A fundamental aspect of Judge Doyle's reasoning regarding the Treaty of 1854 was his conclusion that the Treaties of 1837, 1842, and 1854 all evidence an intent to link occupancy with the exercise of usufructuary rights. Judge Doyle reasoned that because the 1854 treaty provided permanent homes for the LCO band on specified tracts, it withdrew any conditional right to establish such homes on non-reservation lands in the ceded territory.[12] The court concluded that if the right to establish homes on the whole of the territory was lost, the right to hunt and fish thereon was similarly relinquished.

It should be noted that the district judge did not suggest that usufructuary rights are *always* tied to occupancy. Such a conclusion would be clearly inconsistent with precedent such as *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089

12. This aspect of Judge Doyle's reasoning was critical to the result in *Ben Ruby,* 464 F.Supp. at 1352. The right to "occupy" the ceded lands is not before this court, unless one considers entering onto public lands to exercise usufructuary rights a limited kind of "occupancy." For purposes of these appeals, we will assume the correctness of Judge Doyle's conclusion that the Indians' right to occupy the ceded land was terminated by the Treaty of 1854 and will focus solely on whether that finding compels the conclusion that the LCO's usufructuary rights were similarly extinguished.

(1905); *see* Section IV(B)(1), *supra.* His conclusion was simply that the Treaty of 1854, read *in pari materia* with the earlier Treaties of 1837 and 1842, inextricably linked occupancy and usufructuary rights.

In so concluding, Judge Doyle relied on the statement by Chief Buffalo at the treaty negotiations that he now understood the "whole" of these non-reservation lands would go to the United States. The district court stated in *LCO* that this statement "indicates the Indian understanding that they were relinquishing any general claims they might have had to lands outside their reservations." 464 F.Supp. at 1359. The statement made by Chief Buffalo does not compel this conclusion. There is evidence that the Indians misunderstood the Treaties of 1837 and 1842 when those treaties were signed. Rather than recognizing that they were relinquishing title to their territory, the Chippewas then believed that they were merely granting the United States a right to the timber and minerals that were the primary impetus for Governmental interest in the land. Subsequently, the Indians came to understand that they had relinquished title to the territories. In this context, the statement by Chief Buffalo at the time of the 1854 treaty negotiations would appear to be a reference only to the Minnesota land that was to be ceded to the United States pursuant to the 1854 treaty. His words indicate that he understood the Indians were giving up title to that land. There is no justification for construing Chief Buffalo's remarks either as relating to the territories previously ceded or as a "general release" of all Indian claims and rights in those territories.

In addition to his reliance on Chief Buffalo's remarks, Judge Doyle found those aspects of the 1854 treaty pertaining to the Minnesota cession relevant when read *in pari materia* with the Treaties of 1837 and 1842.

## B. In Pari Materia *Analysis*

The portions of the 1854 treaty relevant to this analysis are Articles 1, 2, and 11. Article 1 records a cession of the territory held by the Lake Superior Chippewa residing in Minnesota to the United States. Article 2 grants reservations to, *inter alia,* the LCO band and the Minnesota Chippewas who ceded their land pursuant to Article 1. Article 11 states, in part: "And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President." As a result of this provision, the Chippewas residing in Minnesota obtained treaty-recognized usufructuary rights on non-reservation lands.

The district judge and the defendants think Article 11 suggests that the LCO band, like other Chippewa bands which ceded land pursuant to the earlier treaties, was relinquishing its usufructuary rights in 1854. As stated by the district court: "Had the parties intended the 1854 treaty to continue to preserve those rights in the lands ceded in 1837 and 1842, it is reasonable to believe that they would have made it explicit in 1854." 464 F.Supp. at 1359. The district judge reached this conclusion because usufructuary rights were specifically recognized in Article 11.

We disagree. The Treaties of 1837, 1842, and 1854 are consistent in that each treaty includes both a cession of land and a reservation of usufructuary rights on the ceded land by those Indians relinquishing their territory. The LCO band had ceded its territory pursuant to the two earlier treaties in which its reservations of usufructuary rights were explicit. Omission of any reference to those rights in the 1854 treaty suggests that the LCO band believed their right to use ceded land for traditional pursuits to be secure and unaffected by the 1854 treaty.

We are not persuaded that either the remarks of Chief Buffalo or the absence of an explicit reservation of the LCO's usufructuary rights in the 1854 treaty compel the conclusion that occupancy and usufructuary rights were understood by the Indians and the Government to be inextricably linked at the time of the 1854 treaty negotiations. We turn therefore to a somewhat different line of analysis relied on by Judge Doyle and urged by the defendants.

## C. Relevance of the 1850 Removal Order

This line of analysis posits that the Indians relinquished their usufructuary rights on most of the land previously ceded in return for the Government's promise, in Article 11 of the Treaty of 1854, that they would not be removed from the land completely. That article, in a portion not quoted above, states that the "Indians shall not be required to remove from the homes hereby set apart for them."

This argument is not persuasive in light of considerable evidence in the record indicating the Indians believed both that the Government had abandoned its removal policy by 1854 and that they could be removed only for misbehavior.

First, the Indians had been told by President Fillmore that he would countermand the Removal Order and that the annuities would be paid at a location nearer their homes henceforth. There is evidence that the 1853 and 1854 annuities were indeed paid to the Indians at nearby LaPointe. It is reasonable to conclude that the Indians therefore believed the United States had abandoned efforts to resettle them in more western territory.

It is not necessary for this court to reach a legal conclusion as to whether President Fillmore had the power to or in fact did countermand the Removal Order. Similarly, it is not essential to decide that the Government had repudiated its "removal policy" and would henceforth pursue a "reservation policy." The defendants' argument turns on what the Indians *believed* as a result of the 1850 Removal Order. We conclude only that the evidence suggests the Chippewa *believed* precisely the opposite of what the defendants urge.

Second, as discussed *supra,* the Chippewas believed that they had been promised the right to remain on and use the ceded land unless they misbehaved. They hadn't misbehaved. They were surprised and deeply disturbed by the Removal Order. That Order was subsequently not enforced. These facts suggest that the Chippewa more likely understood that the Government had acknowledged their rights to be subject to extinguishment only upon misbehaving.

## D. Summary

Nothing in the record compels the conclusion that the LCO band understood the Treaty of 1854 as abrogating their treaty-recognized usufructuary rights. Similarly, nothing compels the conclusion that the Government intended such an extinguishment.

Turning first to the Indian understanding of the treaty, the LCO band was heavily dependent on the exercise of their usufructuary activities throughout the ceded region at the time of the treaty negotiations. Even if some Indians contemplated turning to agriculture as a principal means of subsistence, there is no indication such a transition had been implemented to any extent at the time of the treaty. Second, the Indians in fact continued their hunting and fishing activities on the ceded territory long after their reservations were created pursuant to the 1854 treaty. Third, as discussed *supra,* the sequence of events following the attempted removal of the Chippewas in 1850 would logically have confirmed their belief that removal and extinguishment of usufructuary activities could be avoided if they did not harass white settlers. Fourth, as also discussed above, the inclusion in the 1854 treaty of a reservation of usufructuary rights by the Minnesota Chippewas suggests, in our view, that the LCO band believed their usufructuary rights to be secure and unaffected by the treaty.

As to the intentions of the Government, it is noteworthy that the Removal Order of 1850 referred specifically to the extinguishment of usufructuary rights as well as ordering removal of the Chippewas. This suggests that the Government knew the Indians did not understand the exercise of usufructuary rights to be dependent on their permanent occupancy of the land; further, it illustrates that the United States was well able to draft an explicit statement abrogating such rights. The Government's provision of guns and ammunition to the Indians pursuant to the 1854 treaty suggests that the United States did not envi-

sion the Indians abandoning their traditional pursuits.

The rationale employed by Judge Doyle and the arguments advanced by the defendants at best support the implied abrogation of the LCO band's usufructuary rights pursuant to the 1854 treaty. As developed at length in Section IV, *supra,* the extinguishment of treaty-recognized rights by subsequent Congressional act will be found only if it is *clear* that such a termination was intended. The evidence supporting relinquishment or abrogation in the instant case fails to meet that standard. We conclude therefore that the LCO band's usufructuary rights were neither terminated nor released by the 1854 treaty.[13]

## CONCLUSION

As to the collateral matters posed by this appeal, the tribe's motion to dismiss the defendants' cross-appeal in *Ben Ruby* and *LCO* is denied. The defendant's motion to strike the tribe's collateral estoppel argument and the tribe's references in their brief to documents not in the record are denied.

The LCO band enjoyed treaty-recognized usufructuary rights pursuant to the Treaties of 1837 and 1842. The Removal Order of 1850 did not abrogate those rights because the Order was invalid. These aspects of our holding are consistent with the conclusions reached by the judge below. We disagree with the district judge's conclusion that the Treaty of 1854 represented either a release or extinguishment of the LCO's usufructuary rights. At most, the structure of the treaty and the circumstances surrounding its enactment *imply* that such an abrogation was intended. Treaty-recognized rights cannot, however, be abrogated by implication. The LCO's rights to use the ceded lands remain in force.

Having considered all the arguments urged by the parties, the district court's summary judgment in favor of the defendants as to the continued existence of the LCO's usufructuary rights is reversed. The exercise of these rights is limited to those portions of the ceded lands that are not privately owned.[14] The case is remanded to the district judge with instructions to enter judgment for the LCO band on that aspect of the case and for further consideration as to the permissible scope of State regulation over the LCO's exercise of their usufructuary rights.

REVERSED AND REMANDED.

---

**13.** On March 22, 1982, this court denied the tribe's motion to include in the record of this appeal certain documents the tribe believes relevant to construction of the 1854 treaty if a remand on that issue is required. In its combined brief, the tribe again referred to these documents. The defendants moved to strike those portions of the LCO combined brief. This motion has not yet been ruled upon.

In resolving this case, the panel has construed the references to these historical documents as the tribe suggests: a demonstration that more evidence might be presented in support of the tribe's position regarding the 1854 treaty if a remand on that issue were required. As our disposition makes clear, no such remand is warranted. We have reached this conclusion without reference to the documents that are in controversy.

For the purpose of clearing the docket of the outstanding motion, we order that it is hereby denied.

**14.** This court has understood the LCO band's argument to be limited to those portions of the ceded lands that have not passed into private ownership. To the extent that the LCO band might be claiming a broader right—such as the right to engage in usufructuary activities on land that is privately owned but utilized for sport hunting and fishing—we find that the claim is inconsistent with the Indians' understanding at the time of the cession treaties that their rights could be limited if the land were needed for white settlement, *see* Section I, *supra.*