**CENTRAL STATES CONSTRUCTION, INC., Plaintiff,**

v.

**SMALL BUSINESS ADMINISTRATION OF the UNITED STATES of America, Defendant.**

No. 90–1516–K.

United States District Court, D. Kansas.

July 8, 1991.

Kurt A. Harper, Sherwood, Harper & Gregory, Wichita, Kan., for plaintiff.

Lee Thompson, U.S. Atty., Annette Gurney, Asst. U.S. Atty., Wichita, Kan. and Claire M. Schenk, Chief Counsel for Claims and Inv. Co. Liquidation, St. Louis, Mo., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This matter is before the court on cross-motions for summary judgment. Plaintiff Central States Construction, Inc. (CSC) appeals pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, an administrative decision by defendant Small Business Administration of the United States (SBA). The at-issue administrative decision denied CSC admission into SBA's Minority Set Aside Program of its Section 8(a) Business Development Program (the 8(a) program). 15 U.S.C. § 637(a).

The SBA was the first to file a summary judgment request. It asserts CSC was given ample opportunity to present evidence as to whether it qualified as socially and economically disadvantaged pursuant to the statutory and regulatory scheme which governs the 8(a) program. The SBA further asserts that CSC failed to meet its burden of proof on this issue and that a review of the administrative record (AR) confirms this decision was based on a sound and reasonable basis. The SBA also points out that the administrative law judge (ALJ), after reviewing the SBA's hearings and appeals, determined that CSC had failed to establish with clear and convincing evidence that it qualified as socially and economically disadvantaged pursuant to the relevant statutory and regulatory scheme. As a result, the ALJ affirmed the SBA's decision to deny CSC access to the 8(a) program. The SBA contends the AR supports these findings and that the decision was not arbitrary, capricious or contrary to law. Thus, with this court's narrow scope of review of the SBA decision in mind, the SBA contends that the court must grant its summary judgment request.

In addition to making a general denial as to the propriety of SBA's arguments, CSC contends in its response that it is entitled to summary judgment. CSC argues that all of the factual material in the AR leads to the conclusion that CSC met the statutory and regulatory definition of socially and economically disadvantaged and compels a finding that the agency erred. CSC further contends that the decision denying CSC's application is arbitrary and capricious and short of statutory right.

After fully reviewing the pleadings submitted by the parties in support of their motions, the court finds that oral arguments on these motions would not be helpful. As set forth more fully herein, it is found that the SBA's motion for summary judgment should be granted and that CSC's motion for summary judgment should be denied.

■■■ Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510.

In considering a motion for summary judgment, this court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 613 (10th Cir.1988). However, in resisting a motion for summary judgment,

the nonmoving party may not rely upon mere allegations, or denials, contained in its pleadings or briefs. Rather, the party must come forward with specific facts showing the presence of a genuine issue for trial. *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230 (10th Cir.1990).

The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). That is, if on any part of the *prima facie* case there is insufficient evidence to require submission of the case to a jury, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, one of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53.

Counter-motions for summary judgment do not automatically empower the court to dispense with the determination of whether questions of material fact exist. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). The court must consider the counter-motions with no less careful scrutiny than an individual motion. *Missouri Pac. R. Co. v. Kansas Gas & Elec. Co.,* 862 F.2d 796 (10th Cir.1988).

*Findings of Fact*

The following facts have been established pursuant to the above rules.

On October 11, 1988, CSC filed an application for participation in the SBA's 8(a) program and submitted the requisite SBA Form 1010A, 8(a) personal eligibility statement. Eligibility for the program was based on the owner and president of CSC—Nancy S. Hedlund, a white female. (AR, tab D.)

At the time it made the application at issue in this case, CSC was engaged in all phases of construction for commercial, residential and/or industrial projects. (AR, at 82.) Its market area was the greater Wichita area, eastern Kansas, and the greater Kansas City area. (*Id.* at 84). Its customer base was identified as "[m]ostly government entities, such as, McConnell AFB, Wichita State University, City of Wichita, [and the] state of Kansas." (*Id.*)

Attached to CSC's personal eligibility statement form is a lengthy personal statement by Ms. Hedlund in which she explains why she believes she is socially disadvantaged. (AR, pp. 42–56.) In this statement, Ms. Hedlund first explains many difficulties she allegedly encountered in attempting to get bonding and obtain credit. Yet, Ms. Hedlund admits she received a series of 90–day loans and several letters of credit, including one letter of credit for $20,000.00. Ms. Hedlund complains about this letter of credit though: it was allegedly harder for her to obtain than for a like situated male and was allegedly not as much as a male contractor had told her he received with an allegedly less worthy financial statement; the other contractor allegedly told her he did not have to turn over personal assets for the line of credit and she had to turn over all of her personal assets; and she alleges that she was told that the bank monitored her letter of credit more closely and put her through more rigorous questioning every time she wanted to renew her credit line. (*Id.* at 43.) However, no other documentation is submitted which supports what the other contractor allegedly told Ms. Hedlund, and very little evidence is offered to support a finding that it was actually harder for a female to get a line of credit than it was for a similarly situated male.

Ms. Hedlund then goes on to recite in detail the following tragic events from her life: her father abandoning her mother and her siblings before she was born, the family's poverty throughout her childhood, the embarrassment she experienced as a child because her mother was a divorcee, her grandmother's recurring breakdowns, con-

tinual sexual molestation by an older male relative throughout her childhood, lack of competent adult supervision, and her high school pregnancy which she contends prevented her from getting her high school diploma. (AR, tab D, pp. 48–50.)

Next, Ms. Hedlund alleges that one architect tried to keep her from bidding on his school project. She asserts when she first approached the architect about the job he told her the bidders' list was closed. However, after Ms. Hedlund informed him that since the school received federal and state funds the list could not be closed so soon, he allowed her to bid if she traveled to his town to pick up the blueprints and specifications. (*Id.* at 52.)

Ms. Hedlund did bid this project. She was the low bidder and got the project. However, she contends the architect did everything he could to make the project both costly and miserable for her. That is, she implies that one of her subcontractors on this project was in cahoots with the architect and submitted a very low oral bid. But then, after she was determined to be low bidder, the subcontractor sent her a confirmation letter with a much higher price. When she confronted the subcontractor about this, he contended the higher price was what was originally quoted and would not lower the price in the confirmation letter. When she confronted the architect about this, he would not let her change her bid price. Furthermore, she contends that after the project was started, an unforeseeable problem was encountered which increased the cost of the project. Ms. Hedlund alleges that the architect told her to go ahead and do the extra work on a cost plus basis, but when she presented the bill, the architect chose not to approve the change order because he said it was too high. (AR, tab D, pp. 52–53.)

Another incident, which Ms. Hedlund asserts supports a finding of discrimination against her, occurred while she was taking a night class at Wichita State University. While in this class and after being asked by the instructor to tell her occupation, two young men started accusing her of getting jobs without bidding on them. (*Id.* at 54.)

Finally, Ms. Hedlund alleges that in one job, which she was awarded by being low bidder, she had a written quotation from a lumber company for the necessary lumber. Upon calling to talk to the lumber company, the owner asked how her "bod" was and asked to talk to her boss. After informing him that she was the boss, Ms. Hedlund alleges the owner of the lumber company told her he was withdrawing his quotation because he knew she was offended. Ms. Hedlund contends that in spite of the fact she told him she was not offended ("though [she] certainly was"), he refused to do business with her, costing her lots of money since his quote was the lowest. (AR, tab D, pp. 54–55.)

The only record evidence supporting these contentions in Ms. Hedlund's personal eligibility statement is her own affidavit.

It should also be noted that Ms. Hedlund submitted the affidavit of Paul Howard as support for her position. Mr. Howard states in his affidavit that he is the president of Rainbow Construction Company in Wichita, Kansas, and that he has been in the construction business for 20 years. He further represents that it is his opinion a woman engaged in the construction industry in Wichita does not have equal opportunities at obtaining credit, capital, or work, as compared to men engaged in the construction industry. (AR, p. 363.) In addition, as support for the propositions that women in this country have suffered from past prejudices, discrimination and exploitation; are disadvantaged in attempts to start small businesses, especially women contractors; and are not given enough assistance from the SBA, Ms. Hedlund submits several different articles covering women's issues. (*See* "New Economic Realities: The Rise of Women Entrepreneurs," A.R. pp. 374–91; "Facts on Women and Business," AR pp. 393–94; "The 10 Worst Careers For Women," AR pp. 396–97; and "Women in Business," AR pp. 24–27.)

The SBA aptly points out in its reply to this motion that the affidavit of Mr. Howard and the articles offered by plaintiff as support for her case do not in any way

show that CSC or Ms. Hedlund were in any way personally discriminated against because of gender. Furthermore, the SBA point out that the articles submitted by Ms. Hedlund actually could also support a finding that over the last two decades all sectors of the economy have become increasingly open to women, that in the last decade women have started twice as many small businesses as men, and that being a women may actually be an advantage. (SBA's Reply, pp. 5–9.)

In determining whether CSC was eligible for admission into SBA's 8(a) minority set aside program, a series of 10 SBA officials reviewed CSC's application. After this review, SBA determined that CSC's application for admission into the 8(a) program should be denied because Ms. Hedlund failed to prove by clear and convincing evidence that she was socially and economically disadvantaged. In a letter dated May 31, 1989, SBA notified Ms. Hedlund that CSC had been denied 8(a) program participation. That letter stated it could not be determined that Ms. Hedlund, the one upon whom eligibility was based, was socially and economically disadvantaged, since insufficient evidence had been presented to conclude that "[Ms. Hedlund's] ability to compete in the marketplace has been impaired due to discriminatory practices against you and/or your firm because of your gender." (AR, p. 36.)

On June 21, 1989, CSC filed notice with the SBA of its intent to request reconsideration of the SBA's adverse determination of its application for participation in the 8(a) program. A number of SBA program officials then reviewed CSC's reconsideration request. (AR, pp. 19–22.)

In a letter dated January 8, 1990, Ms. Hedlund was informed by the SBA that CSC's reconsideration request had been denied. The SBA noted that CSC had not presented any new evidence that would allow the SBA to conclude upon the basis of clear and convincing evidence that Ms. Hedlund was socially and economically disadvantaged. Specifically, that letter set forth the following:

a) the problems you have identified are not uncommon to small businesses, actually it appears that your firm had an advantage over others because your firm began operations with contracts already in place, a $25,000 money market account, and income of nearly $500,000 over a six month period; b) it is not clear or convincing that your firm was denied financing because of your gender. You did not provide any evidence which clearly and convincingly demonstrates that while other construction firms were extended credit, yours, which was equally qualified, was not. Therefore, we cannot assume that your gender was the sole reason for the lending institution's decision to deny your firm credit; and c) it appears that your exposure to the business world equals less that six years, therefore we are unable to regard your experiences as longstanding, chronic, or substantial....

In addition, except for your affidavit, the documentation provided in your reconsideration request referred to the treatment of women as a group, rather that you individually. SBA regulations provide that an individual who is not a member of the Black American, Hispanic American, Asian American, Native American, or Asian Pacific American groups must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a nondesignated group which could be considered socially disadvantaged.

(AR, tab A, p. 19.)

On or about February 12, 1990, CSC filed with the SBA's office of Hearings and Appeals a petition for review of SBA's decision denying it admission into the 8(a) program. On October 9, 1990 the ALJ, Judge Usher, issued the final decision of the agency.

In this decision, Judge Usher goes to great effort to address the administrative record in detail. After doing such, he concludes that reasons a) and c) given in the SBA's January 8, 1990 letter—a) that CSC had an advantage over other firms because it started with contracts already in place, a

$25,000 money market account, and income of nearly $500,000 over a six-month period; and c) that since her experience in the business world was less than six years, it could not be considered longstanding, chronic, or substantial—were not consistent with SBA regulations (13 C.F.R. §§ 124.106 and 124.107 respectively) and could not be used as support for denying CSC access to the 8(a) program. (AR, p. 218.)

In regard to whether Ms. Hedlund, the individual upon whom eligibility in the 8(a) program was based, was socially and economically disadvantaged, Judge Usher found in relevant part as follows:

> The evidence adduced by the Petitioner, in large part, addressed the fact of the social disadvantage endured by women in general, rather than the question of Hedlund's own personal disadvantage. For example, the excerpts taken from testimony given at congressional hearings, reports from Congressional committees, treatises, magazine articles and trade association publications relate not at all to the social or economic disadvantage of the individual upon whose social disadvantage the Petitioner's eligibility depends. Likewise, the affidavit of the President of Rainbow Construction Company has to do with, not the social or economic disadvantage of Hedlund, but "[any] woman engaged in the construction industry in Wichita, Kansas...."

The requirement of the regulation at 13 CFR 124.105(c)(ii) is unmistakable:

> The individual must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged.

On the other hand, while the many unhappy events described in Hedlund's affidavit and in the lengthy attachment to her applications relate to her as an individual woman, and specifically to her as the individual woman whose eligibility is in question, they either do not prove that she is disadvantaged because of her womanhood or do not amount to evidence of "prejudice or bias" as is required by

definition of social disadvantage set out in the regulation at 13 CFR 124.105(a). The poverty of her family when she was a child; the abandonment by her father; and the absence of adult supervision can hardly be found to have resulted in bias against her in her role as a businesswoman. Her inability to complete her education did not result solely from her womanhood, although her education may have been interrupted, and its completion thereby delayed, by her pregnancy when she was in her teenage years. Likewise, it is not clear that the dissolution of her marriage was the cause of bias or prejudice against her.

> The petitioner has not proved that Hedlund's womanhood was the cause of the rejection of the firm's attempts to secure financing and bonding from the various banks and bonding firms mentioned. Most of Hedlund's assertions regarding prejudice and bias are based on perception and inferences drawn from events, which, in and of themselves, do not necessarily prove the existence of bias and prejudice. To the extent her assertions are of a more objective nature, i.e., based on comparative situations, she has failed to adduce specific evidence to prove those comparisons. Thus, her assertions do not rise to the level of clear and convincing evidence.

(AR, pp. 226–27 (footnote omitted).)

### Conclusions of Law

Since this matter is before the court on appeal from an administrative decision by the SBA, the standard of review for this matter is governed by the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Both parties agree that the standard found in 5 U.S.C. § 706(2)(A)—whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"—applies to the case. In addition, since CSC contends that the SBA decision is short of statutory right (Response, p. 17), the court must also determine whether the action by the SBA is "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

■ In determining whether the agency acted within the scope of its authority, the court must determine whether, on the facts, the agency's decision can reasonably be said to be within the range of authority given to the agency by Congress. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). If the agency acted within the scope of its statutory authority, then the court must determine whether the agency's findings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(C). This determination requires the court to evaluate whether the decision was based on a consideration of the relevant factors and whether a clear error of judgment has been committed. *Volpe*, 401 U.S. at 416, 91 S.Ct. at 823. This review is a narrow one; the court is not to substitute its judgment for that of the agency. *Id.*

■ The at-issue administrative provision is 13 C.F.R. § 124.105. That provision states in part that:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identities as members of groups without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control.

13 C.F.R. § 124.105(a). Certain groups such as Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, etc., are presumed to be socially disadvantaged absent evidence to the contrary. 13 C.F.R. § 124.105(b). That provision also states that individuals who are not members of a group designated in § 124.105(b) must establish the following by clear and convincing evidence to show social disadvantage:

> (i) The individual's social disadvantage must stem from his or her color ethnic origin, gender, physical handicap, long-

term residence in an environment isolated from the mainstream of American society, or other similar cause not common to small business persons who are not socially disadvantaged.

> (ii) The individual must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged.

> (iii) The individual's social disadvantage must be rooted in treatment which he or she has experienced in American society, not in other countries.

> (iv) the individual's social disadvantage must be chronic and substantial, not fleeting or insignificant.

> (v) The individual's social disadvantage must have negatively impacted on his or her entry into and/or advancement in the business world.

13 C.F.R. § 124.105(c)(i), (ii), (iii), (iv), and (v).

CSC contends that 15 U.S.C. § 637 does not create any presumption that one class of citizens is more entitled to participate in the 8(a) program. Thus, CSC argues that SBA regulations doing such are short of statutory right.[1]

This argument is not persuasive. Congress gave the SBA broad discretion to fulfill the authorities granted to the SBA under the 8(a) program. *See* 15 U.S.C. § 637(a). Specifically, the SBA is granted the authority to determine whether a group has been subjected to the requisite bias and prejudice to be considered socially disadvantaged individuals. 15 U.S.C. § 637(a)(8). Thus, it is clear the SBA had the authority to issue regulations which established who was socially disadvantaged.

Furthermore, in the "Declarations of Policy" provision with respect to the SBA's business development programs, it is stated that Congress finds in relevant part as follows:

---

**1.** It should be noted that neither party raises any constitutional issues in this case. Thus, no such issues are addressed herein.

[T]hat such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian Tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities.

15 U.S.C. § 631(f)(1)(C). This provision seems to clearly indicate that Congress specifically contemplated that certain groups would be included within the 8(a) program.

The "Declarations of Policy" provision also states that Congress finds with respect to "programs and activities authorized by this chapter" that:

[P]rograms and activities designed to assist small business concerns owned and controlled by women must be implemented in such a way as to remove such discriminatory barriers while *not adversely affecting the rights of socially and economically disadvantaged individuals.*

15 U.S.C. § 631(h)(1)(H) (emphasis added). This provision seems to be a clear indication that Congress intended that women, as a group, were not included within the definition of "socially and economically disadvantaged individuals."

In sum, the court finds that the SBA was specifically given statutory authority to determine who was socially disadvantaged pursuant to 15 U.S.C. § 637(a)(8). Furthermore, designating certain groups as presumed to be socially disadvantaged and requiring others to show by clear and convincing evidence they are socially disadvantaged is not contrary to that statutory authority.[2]

Next, the court must determine whether SBA's decision was arbitrary, capricious or unsupported by the evidence pursuant to 5 U.S.C. § 706(2)(A). This requires the court to determine whether the decision to deny CSC access to the 8(a) program was based on a consideration of the relevant factors and whether a clear error of judgment has been committed. *See Volpe*, 401 U.S. at 416, 91 S.Ct. at 823.

As the court has already established, Congress gave the SBA the authority to determine who was considered a socially disadvantaged individual and the procedure set forth in 13 C.F.R. § 124.105 for doing such is within that authority. In relevant part, that regulation requires individuals who are not members of certain designated groups to establish by clear and convincing evidence that "she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged." 13 C.F.R. § 124.105(c)(ii).

There is no dispute that Ms. Hedlund is not a member of one of those designated groups. Thus, Ms. Hedlund must prove by clear and convincing evidence that "she personally suffered social disadvantage." However, as pointed out more fully in this court's findings of facts and by Judge Usher below, most of the evidence submitted by the plaintiff goes toward establishing the social disadvantage of women in general. It does not in any way show Ms. Hedlund personally suffered "racial or ethnic prejudice or cultural bias because of" her identity as a member of a group "without regard to [her] individual qualities." 13 C.F.R. § 124.105(a) and (c)(ii). Furthermore, evidence which might actually show Ms. Hedlund did personally suffer from the requisite discrimination is only supported by Ms. Hedlund's own bold allegations.

■ In sum, the SBA had the statutory authority to enact the relevant regulation. In addition, the relevant regulation requires Ms. Hedlund to show by clear and convincing evidence that she personally suffered social disadvantage. Thus, since CSC was denied access to the 8(a) program because of insufficient evidence that Ms. Hedlund (the one upon whom eligibility in the program was based) was socially disadvantaged, the relevant factors were considered. Furthermore, since the record evidence does not clearly and convincingly establish that Ms. Hedlund personally suf-

---

2. It should be noted that 13 C.F.R. § 124.105(d) specifically sets forth the procedure for adding a group to the group that is presumed to be socially disadvantaged under § 124.105(b). There is no evidence or allegation in this case that Ms. Hedlund argued that women should be consider socially disadvantaged pursuant to that provision.

fered social disadvantage, no clear error of judgment has been committed. Therefore, the decision by the ALJ must be affirmed.

IT IS THEREFORE ORDERED this 8 day of July, 1991, that defendant Small Business Administration's motion for summary judgment (Dkt. No. 7) is granted, and that plaintiff Central States Construction's motion for summary judgment (Dkt. No. 9) is denied.